Scott v. Chope.

# R. M. Scott et al. v. Emma Chope.

[Filed September 29, 1891.]

33    41
†40   274
40    279
41    251

33    41
42    116

33    41
44    632

33    41
45    826

33    41
48    147

33    41
51    403
52    176
53    481
55     17

33    41
56    642

1. **Liquors**: Action for Loss of Support: Instructions. Upon the trial of a cause brought by C. against S. and others, for damages for the loss of support in the death of her husband, whose death was caused by the defendants' having furnished intoxicating liquors to the said husband which he drank and which made him intoxicated, and in which intoxicated condition he started for his home and became lost, lost his team, and endeavoring to pursue his way on foot became exhausted, and the weather being very cold, and the snow deep, became frozen and died, some evidence was given by defendants, without allegation by answer, tending to disprove that freezing was the cause of the death, and that it was caused by violence. The court on its own motion charged the jury that if it should find from the evidence that the deceased came to his death by violence inflicted by any other person, and that the person inflicting the violence was intoxicated at the time, and that he obtained the liquor, which caused his intoxication, from the defendants, or either of them, and that he would not have used such violence except as the result of such intoxication, in that case such of the defendants and their bondsmen as furnished such intoxicating liquor would be liable. The verdict being for the plaintiff, on error, *held*, that the giving such charge was not reversible error.

2. ———: License: Evidence: The Village Record, or minute book of the trustees, showing the proceedings of the board in relation to granting liquor licenses and the approval of the bonds of liquor sellers, *held*, admissible in evidence.

3. ———: Trial: Jury: The petition alleged that S. and G. obtained a liquor license in the village of A.; that C. and H. became sureties on their bond; that C. and S. also obtained a liquor license in said village, and W. and S. became sureties on their bond; that afterwards S. and G. and C. and S., respectively, being engaged in the sale of intoxicating liquors under their respective licenses, W. C., the husband of the plaintiff, obtained of them, in their respective liquor saloons, intoxicating liquors which he drank, which made him intoxicated, and caused his death and loss of support by the plaintiff. At the close of the trial, it being late in the night, the court directed the jury that should they agree upon a verdict

during the night, that their foreman should sign it in their presence and seal it up, and that they then might separate and come in at the meeting of the court next morning. The next morning, the jury, having agreed upon a verdict, sealed it, and separated during the night, came into court and delivered their verdict as set out in the body of this opinion. The court refused to receive said verdict, but sent the jury out with directions to correct it. Whereupon the jury returned the verdict as set out in the body of this opinion, which was received. *Held,* No error.

4. ———: ———: ———: CHALLENGES. The overruling of the challenge for cause, of the juryman Timmerman upon his examination, as set out in the opinion, *held,* no error.

5. ———: JOINT ACTIONS: MOTION FOR NEW TRIAL. In a joint action against six defendants, S., G., C., H., W., and Sh., the verdict was against all the defendants. There was a joint motion for a new trial by all of the defendants except H., who made no motion. There was evidence to sustain the verdict as to the defendants S., G., and H., but not as to Sh., and doubtful as to W. and C. *Held,* That the motion for a new trial was rightly overruled as to all the defendants.

6. ———: WAIVER: THE ASSIGNMENT OF ERROR, that the damages are excessive, appearing to have been given under the influence of passion or prejudice, not being argued or referred to in the brief of counsel, is not examined.

ERROR to the district court for Valley county. Tried below before TIFFANY, J.

*J. N. Paul, Aaron Wall, O. A. Abbott,* and *Thomas Darnall,* for plaintiffs in error, cited, as to the motion for a new trial : Tidd's Prac., marginal, p. 911, and cases ; *Sperry v. Dickinson,* 82 Ind., 138; *Graham v. Henderson,* 35 Id., 195; *Easton v. Calendar,* 11 Wend. [N. Y.], 96; *Richards v. Walton,* 12 Johns. [N. Y.], 434; *Gray v. Richardson,* 18 Pick. [Mass.], 417; *Shirley v. Lunenburg,* 11 Mass., 384; *Smelters v. Rainey,* 14 O. St., 288 ; *Buckingham v. Bank,* 21 Id., 131 ; *Blanchard v. Gregory,* 14 O., 415. As to the jurors: *Curry v. State,* 4 Neb., 549 ; *Brunell v. R. Co.,* 5 Id., 453.

*A. M. Robbins,* and *A. Norman, contra,* cited, as to the motion for a new trial: *Real v. Hollister,* 20 Neb., 112; 17 Id., 661; *Wiggenhorn v. Kountz,* 23 Id., 691; *Long v. Clapp,* 15 Id., 424; *Dutcher v. State,* 16 Id., 33; *Dunn v. Gibson,* 9 Id., 513; *Feeney v. Mazelin,* 87 Ind., 229; *Estey v. Burke,* 19 Id., 87; *Teters v. Hinders,* Id., 93; *Eichbredt v. Angerman,* 80 Id., 208; *Bank v. Colter,* 61 Id., 153; *Robertson v. Gartshwiler,* 81 Id., 463; *Boyd v. Anderson,* 102 Id., 221; *Sperry v. Dickinson,* 82 Id., 138; Thompson, Trials, sec. 2721; *Boldt v. Budwig,* 19 Neb., 739, 746. As to the jurors: *Bohanan v. State,* 18 Neb., 57. As to the sixth instruction: *Rogers v. Millard,* 44 Ia., 466; Sackett's Instruction to Juries [2d Ed.], 22; Thornton's Instructions to Juries, sec. 201; *Union Ins. Co. v. Buchanan,* 100 Ind., 63; *Bowers v. Thomas,* 22 N. W. Rep. [Wis.], 710; *Flanders v. Cottrell,* 36 Wis., 564; *Stetler v. R. Co.,* 49 Id., 609; *Marschuetz v. Wright,* 50 Id., 175, 178; *Hoffman v. Gordon,* 15 O. St., 211; *Chamberlain v. R. Co.,* Id., 250; *Hogg v. Mfg. Co.,* 5 O., 410; *Pugh v. Calloway,* 10 O. St., 493; *Scott v. Sheakly,* 3 Watts [Pa.], 50. As to the separation of the jury: Abbott's Trial Brief, 183, 184; *Warner v. R. Co.,* 52 N. Y., 437; *Tyrrel v. Lockhart,* 3 Blackf. [Ind.], 136; *Reitenbaugh v. Ludwick,* 31 Pa. St., 131; *Bolster v. Cummings,* 6 Me., 85; *Sutliff v. Gilbert,* 8 O., 405; *Mason v. Massa,* 122 Mass., 477; *Brown v. Dean,* 123 Id., 254; *Maclin v. Bloom,* 54 Miss., 365.

COBB, CH. J.

This cause comes to this court upon error from the district court of Valley county, in which court the defendant in error recovered a judgment against the plaintiffs in error. The cause of action set out in the petition in the court below is as follows:

"1. That on or about the —— day of April, 1887, the

defendants, R. M. Scott and John Gorman, as principals, and John G. Cory and Edgar L. Hall, as sureties, made and· executed their certain bond to the state of Nebraska in the penal sum of $5,000, conditioned that the said defendants, Scott and Gorman, would pay all damages, fines, forfeitures, and penalties that might be adjudged against them under the provisions of the law regulating the sale of malt, spirituous, and vinous liquors; that in accordance with said law regulating the sale of said liquors, the village authorities of. the village of Arcadia duly approved said bond and issue a license to said defendants, Scott and Gorman, jointly, in due form of law, to sell malt, spirituous, and vinous liquors in the said village of Arcadia for the period of one year from the —— day of May, 1887, to the —— day of May, 1888; that under and by virtue of said license so issued the said Scott and Gorman were so engaged in the traffic and business of selling malt, spirituous, and vinous liquors at the said village of Arcadia on the 30th and 31st days of December, 1887.

"2. That on or about the —— day of April, 1887, the defendants, John G. Cory and William· Shamburg, as principals, and John Wall and R. M. Scott, as sureties, made and executed and delivered to the state of Nebraska their certain bond in the penal sum of $5,000, conditioned that the defendants, John G. Cory and William Shamburg, would pay all damages, fines and forfeitures, and penalties that might be adjudged against them under the provisions of the law regulating the sale of malt, spirituous, and vinous liquors; that in accordance .with said law regulating the sale of said liquors, the village authorities of the village of Arcadia duly approved said bond and issued a license to said John G. Cory and William Shamburg, jointly, and in due form of law, to sell malt, spirituous, and vinous liquors in said village of Arcadia for the period of one year from the —— day of May, 1887, to the —— day of May, 1888, and under and by

virtue of the license so issued the said Cory and Shamburg were engaged in the traffic and business of selling malt, spirituous, and vinous liquors in the said village of Arcadia on the 30th and 31st days of December, 1887.

"3. That during the time aforesaid the plaintiff, Emma Chope, was, and for a long time prior thereto had been, the wife of William Chope, and is the mother of Clarence Chope, the minor son of the said William Chope and the plaintiff, who is of the age of six years, and that the plaintiff and said minor son were dependent on the said William Chope for their means of support.

"4. That the said William Chope was an able-bodied, industrious, and energetic man of twenty-four years of age and provided a good living for his family, the plaintiff and child aforesaid, and that the proceeds of his labors and earnings amounted to about the sum of $600 per year, which said sum was applied to the support of his family aforesaid.

"5. That on the 30th or 31st days of December, 1887, the said William Chope obtained liquors from the defendants Scott & Gorman, and from the defendants Cory & Shamburg, at and in their saloons in the village of Arcardia, which said liquors were sold to said William Chope by the defendants Cory & Shamburg and Scott & Gorman, and were there drank by the said William Chope, and that by reason of the liquors so furnished and sold to the said William Chope, by the said Scott & Gorman and the said Cory & Shamburg, and drank by him, the said William Chope, he became intoxicated and exceedingly drunk.

"6. That in said drunken and intoxicated state and condition the said William Chope started for his home about 7 o'clock in the evening; that the said William Chope resided at that time about eight miles from the said village of Arcadia, and that by reason of the intoxication aforesaid the said William Chope lost his head and became lost

on the prairie, and wandered about until he became numb and stiff from the effect of the aforesaid intoxication and laid down, and was unable to go further and then and there was frozen to death; and that the death of the said William Chope was caused by the liquors so sold by the defendants to the said Chope and obtained from them, the said defendants, by him and drank by him, and the intoxication then and there produced.

"7. That the said William Chope became numb, stupefied, and bewildered, and lost his way and upset and overturned his sled, and became lost from his team and lost on the prairie, and became frozen to death, and plaintiff has thereby been deprived of the means of support to herself and child aforesaid which would otherwise have been furnished by said William Chope fully in consequence of the traffic of said Scott & Gorman and Cory & Shamburg in said intoxicating liquors as aforesaid, and the sale or giving away to said William Chope of the intoxicating liquor aforesaid and so drank by him as aforesaid, and by reason thereof the condition of said bonds have become broken and this plaintiff entitled to recover from the principals and sureties on said bonds her just and adequate damages so as aforesaid sustained thereby; and further, that said plaintiff has suffered damages by reason of the death of her husband as aforesaid in the loss of her means of support to herself and child aforesaid, in the sum and to the amount of $10,000, and that no part of the same has been paid and the same is now wholly due from the defendants to the plaintiff.

"8. That plaintiff is unable to set out or attach to the petition a copy of the liquor bonds so executed as aforesaid for the reason that, as she is informed and believes, the said bonds have been withdrawn from the possession of the officers of the village of Arcadia, and are now under the control of the defendants; that plaintiff has made diligent search for said bonds, and made inquiry and demand

Scott v. Chope.

of the proper officers of said village of Arcadia for said bonds or a copy of the same, but cannot obtain the same, and was told by said officers that said bonds had been taken away from them and could not be furnished, and therefore plaintiff is unable to attach to her petition a copy of the same; with demand for judgment to the amount of $10,000 and costs."

The said defendant John Wall made answer to the above petition, and in his own behalf admitted that "during the spring of 1887 he signed a bond as one of the sureties of John C. Cory and William Shamburg, then doing business as copartners under the style and firm name of Cory & Shamburg, but whether the bond so signed by the defendant was the same bond sued on in this case the defendant has no knowledge except such as is derived from an inspection of the plaintiff's petition, and therefore denies that he executed the bond sued on in this cause, and demands proof of said fact and of the nature thereof, as alleged in the plaintiff's petition, and denies that he has, or ever has had, possession of the bonds sued on, and denies that he has any knowledge of its whereabouts, or ever had any such knowledge.

"2. That he has no knowledge as to whether the said William Chope drank any liquor at the time alleged, or whether such liquor in any way or manner contributed to the death of the said William Chope, except such as is derived from an examination of said plaintiff's petition, and therefore denies said facts, and each and every of them, and demands such proof.

"3. That on or about the —— day of ——, 1887, and long prior to the date of the alleged sale of liquors by said Cory & Shamburg to said William Chope, the firm of Cory & Shamburg was dissolved by mutual consent, and that at the time of the alleged sale of liquors to the said William Chope, and for a long time prior thereto, the said firm of Cory & Shamburg had ceased to do business under

their license, and have never since resumed their business relations or engaged in the sale of liquors of any kind at Arcadia or elsewhere, whereby said license became null and void, and this defendant and all other sureties on their said bonds released from all the conditions thereof, and denies every allegation in said petition contained not herein expressly and in terms admitted, and prays to go hence without day and for his costs."

The defendant Edgar L. Hall made answer in said cause for himself only, in which he alleged that he denies all and single the allegations in the plaintiff's petition contained.

The defendants R. M. Scott and John Gorman made and filed their answer in said cause in their own behalf, in which they admitted that during the spring of 1887 they obtained license of the village board of the village of Arcadia, and that they were doing business under the firm name and style of Scott & Gorman, and they, doing business under the firm name of Scott & Gorman, executed a bond to the state of Nebraska in the penal sum of $5,000, but they deny that they or either of them know of the whereabouts of said bond, and they therefore deny that the same is the bond sued upon in this action, and they demand that the plaintiff be required to prove the same; that they deny that William Chope obtained any liquor of these defendants, or that he drank any liquor obtained of these defendants at the time or times mentioned in plaintiff's petition, or at any other time, and they deny that the said William Chope came to his death by reason of, or in consequence of, having drank intoxicating liquors, and deny that they in any way or manner contributed to or caused the death of the said William Chope by any of the means aforesaid or in any other manner whatever. They deny such (*sic*) other allegations in plaintiff's petition contained and not in his said answer admitted.

The defendant John G. Cory made and filed his answer to the above petition and alleged:

"1. That he admitted that in the month of May, 1887, he was engaged with one William Shamburg, one of the above named defendants, in the business of retail dealer in the village of Arcadia, in the county of Valley, and that said business was conducted under the firm name and style of Shamburg & Cory. He further admits that the said firm made and executed a bond as required by law; and defendant, further answering, says that he knows nothing of the whereabouts of said bond, and that he has never seen the same since it was executed, nor has not now, nor never has had the same in his possession since the execution thereof, and whether said bond was filed or not he has no knowledge or information by which he could admit or deny and, therefore, demands proof.

"2. That on or about the 6th day of July, 1887, and long before the date of the alleged sale of liquors to the said William Chope, the firm of Shamburg & Cory was, by mutual agreement, dissolved, and that notice of said dissolution was published in the Arcadia *Courier*, a paper of general circulation in the said county of Valley, and said first publication was made July 6, 1888, and after which said dissolution of the 6th day of July, the defendant removed from the village of Arcadia and said copartnership ceased to exist on the said 6th day of July, and that said defendant has had no interest, either directly or indirectly, in said business since the 6th day of July, 1887.

"3. He denies each and every allegation contained in said plaintiff's petition not herein specifically admitted or denied.

"4. He has no knowledge or information of signing a license or bond of Scott & Gorman, as alleged in plaintiff's petition, and therefore neither admits nor denies the same, but calls for proof."

It appears, in a negative kind of a way, from the record, that the default of the defendant William Shamburg had been entered in the case, and it appears that on De-

7

cember 4, 1888, he filed a motion in court to set aside the default against him and that he be allowed to enter his separate answer in the case, as it is said in the motion, for the reasons set out in the affidavit and answer hereto attached. Then follows the paper referred to as an affidavit and answer purporting to have been filed on the same day in the office of the clerk of said court. This paper is in the form of an affidavit by the said William Shamburg, and alleges that he is one of the defendants in the case now pending in the district court in and for Valley county and said state, wherein one Emma Chope is plaintiff and R. M. Scott and others are defendants; that summons in said case was served on him on the 11th of February, 1888, and that very soon thereafter, and before the time for answering had expired, affiant was called to Chicago, Illinois, to come immediately and without delay to the bedside of his sister, who was very ill and not expected to live; and that he went immediately to Chicago and found that she was dead and that his nephew and a son of this sister was very ill upon affiant's arrival in Chicago, and that he remained and assisted in nursing the said child throughout his entire sickness and up to his death; that by reason of said sickness and death affiant was sorely grieved in mind, and wholly neglected to attend to any of his affairs in this state for the period of five or six weeks and until long after the time for final answer in said cause; that he has a meritorious defense to this action, in that at the time of the death of William Chope, as set forth in plaintiff's petition, this affiant had no interest in the saloon in Arcadia, Nebraska, as set out in said petition, and that affiant was not engaged in the occupation, either directly or indirectly, of selling malt, spirituous, and vinous liquors.

There was a trial to a jury, with a finding and judgment for the plaintiff. The defendants bring the cause to this court on error. Twenty-four errors are assigned, as follows:

"1. The court erred in overruling the motion of the plaintiffs in error for a new trial.

"2. The verdict is contrary to law.

"3. The verdict is not sustained by sufficient evidence.

"4. Errors of law occurring at the trial and duly excepted to at the time.

"5. The damages are excessive, appearing to have been given under the influence of passion or prejudice.

"6. The court erred in refusing to give the first, second, and third instructions asked by the defendants.

"7. The court erred in giving instruction number six (6) of its own motion.

"8. The court erred in giving instruction number seven (7) of its own motion.

"9. The court erred in giving instruction number eight (8) of its own motion.

"10. The court erred in giving instruction number five (5) asked by the plaintiff.

"11. The court erred in giving instruction number six (6) asked by the plaintiff.

"12. The court erred in admitting a minute book and records and papers of the village of Arcadia, over the objections of the defendant.

"13. The court erred in permitting the jury to return to their room to change their verdict after having returned a sealed verdict into court and having separated.

"14. The court erred in receiving the verdict of the jury as it now is.

"15. The court erred in not receiving the first verdict of the jury.

"16. The court erred in directing the jury to return to their room and bring in another verdict than was by them returned in court.

"17. The court erred in giving instruction to jury No. A after first verdict was returned into court.

"18. Irregularity in the proceedings in this court al-

lowed the jury to separate and go out of the custody of
the officers before the return of the last verdict, and after
arriving at their first named verdict and sealing same, but
before its return into court.

"19. The defendants John Wall and John G. Cory
especially except to the above alleged errors and instruc-
tions refused and excepted to, and instructions given at re-
quest of plaintiff and duly excepted to by these defendants.

"20. The court erred in giving instruction No. B of its
own motion duly excepted to by defendants.

"21. The court erred in giving instruction No. C and
duly excepted to by defendants.

"22. The court erred in overruling the defendants' chal-
lenge, for cause, to juryman W. J. Timmerman, to which
ruling and decision of the court defendant excepted at the
time.

"23. The court erred in calling the jury together after
they had signed and sealed their verdict and separated and
gone, and then sending them out to amend their verdict,
which was duly excepted to by defendants at the time.

"24. The court erred in permitting the jury to return
the last verdict, which was different in form and in amount
from the first verdict, which was duly excepted to at the
time."

There was evidence on the part of the plaintiff that the
plaintiff was the wife of William Chope, and that plaintiff
and her husband were the parents of Clarence Chope, an
infant son seven years old at the time of the trial; that
William Chope, at the date of his death, was about twenty-
four years old; that he and his wife, having emigrated from
Illinois about a month before, were temporarily residing
with George Stone, the father of Mrs. Chope, on his farm
at a point ten or twelve miles northwest from the village of
Arcadia in Valley county; that William Chope was, on
that day, to-wit, the 30th day of December, 1887, in good
health; that he and plaintiff had been married about seven

and one-half years, and that they were married in the state of Illinois, where he was engaged in farming and teaming and in operating a farm on shares for his father most of the time. During that time they went to the state of Iowa, where they remained about a year, he being engaged in teaming, cutting hay, and similar occupations. From thence they returned to the state of Illinois and remained about three years, he being engaged in teaming and contracting, whereupon they emigrated to this state as aforesaid; that he had made arrangements to take a place on shares for the ensuing year, but had made no binding contract therefor; that he was a man of industrious habits, a good and successful teamster and manual laborer, but addicted to the use of ardent spirits. All the evidence in the record upon that subject is to the effect that his earnings were about $600 a year, which he devoted to the support of his family, which the evidence tends to show he supported in good and comfortable style for a laboring man. The enumeration of personal chattels and furniture, made on cross-examination by the plaintiff when on the witness stand, shows this. Besides the furniture and household goods suitable for a family of the size and condition of his, he also was the owner of a good team of horses, a wagon and sled, there being a mortgage incumbrance upon the wagon.

The evidence further tends to prove that on the forenoon of the 30th or 31st of December, 1887, the deceased, William Chope, and his father-in-law, George Stone, left the house of the latter, where also the deceased was temporarily residing, with a load, or part of a load, of pork upon a bob-sled drawn by two horses, and drove to the village of Arcadia; that after arriving there and disposing of their pork and transacting some other business, the deceased preceded his father-in-law into one of the two saloons or places where intoxicating liquors were sold at retail in that village, being followed soon after by Stone.

They two obtained from the keeper of said saloon and drank each a glass of beer. This was followed soon after by the deceased calling for and each drinking a glass of whisky. Also that they soon after went out of that saloon and into the other saloon or place of selling liquor, and there engaged in the pastime called shaking dice for the drinks, and there drank, in what appears from the evidence to have been rather rapid succession, several drinks of whisky which they obtained from the barkeeper of said last mentioned saloon. It is clear from the testimony that by this time they were both greatly under the influence of intoxicating liquors which they had drank and far on the road towards gross inebriety. The day was quite cold, considerable snow on the ground and freezing. Somewhere about 8 o'clock at night they took their team from the stable where it had been put up and started for home. It appears from the evidence that they were utterly bewildered upon starting, neither of them knowing apparently which way to go in order to gain the road which led in the direction of their home. They stopped at a number of places within a few miles from Arcadia to inquire the way and to warm. At about 10 o'clock of that night they appeared at the house of the witness James Sterling, about six and one-half miles northwest of Arcadia and near the road leading to the residence of Stone. Stone reached the house of Sterling first, and by hammering on the door waked Mr. Sterling up and, upon invitation, he entered the house and behaved in a manner indicating that he was intoxicated. After setting down and warming himself at the invitation of Mr. Sterling, he stated that their team had got away from them and that Will, as he called his son-in-law, the deceased, was gone after them. Shortly afterwards, Chope, the deceased, also came in, and, at his solicitation, Mr. Sterling got up and went with them to the place where the team had got away from them, Stone remaining at the house until Sterling and Chope

Scott v. Chope.

went to the place where the horses had got away from the sled and found that the horses had gone, taking with them the forward bob of the sled and leaving the wagon bed, which was on the sled, and the rear bob there.   Mr. Sterling persuaded Chope that the horses had probably gone home, and Chope returned to the house with him, where they found Stone, who had extinguished the light in a vain attempt to light his pipe, and who was exceedingly loath to leave the house, but upon Chope insisting that he must and would go home they left together on foot at about 10 o'clock at night, according to the evidence of Mr. Sterling, although I think from the whole evidence it was considerably later than that.   They were at this time evidently both quite intoxicated, from their actions and the smell of liquor upon the young man, the deceased, according to the evidence of Mr. Sterling.   The night was very cold and stormy at this time.

There is evidence tending to prove that there was an unoccupied house or shanty some half a mile or more from the residence of Mr. Sterling ; that they reached that point and spent a considerable time in the lee of the house sheltering themselves from the cold northwest wind.

From the evidence of Stone and the fact of the dead and frozen body of Chope having been found the next day at the place it was, it would appear that leaving this shanty they pursued their way about three-quarters of a mile further in the general direction of Stone's house where Chope became unable to go further, where he fell and laid down, and Stone being unable to arouse him, remained with him evidently until about morning, when he left him and succeeded in reaching the house of Mr. Webster at about half-past eight o'clock.

As above stated, it appears that at this time there were two saloons or places where intoxicating liquors were sold at retail in the village of Arcadia.   One is called by some of the witnesses the " East " saloon.   This, it appears, was at the

time kept by the defendants Scott & Gorman, and it was in this saloon that the witness Stone and the deceased first drank on that day, and there they both drank beer and whisky, and from there they went directly to the other saloon which some of the witnesses call "Reed's" saloon and some call Shamburg & Cory's saloon, and there, according to the testimony of Stone, they drank a drink of whisky apiece and then got to shaking dice; that Chope, the deceased, shook dice for whisky and drank it, then witness shook dice with the barkeeper for whisky twice and each time lost, and, as he expresses it, " we got the whisky and drank it." To the question, " Did Chope drink it? " witness answered, " Of course he did." To the question, "State what Chope did with the whisky," he answered, " He drank the whisky, I lost it and had to pay for it."

The witness Boone Hawthorne stated that he was there in that saloon on that day, the 30th day of December, saw the deceased and Stone there. This witness called it " Reed's" saloon. In answer to the question whether or not that saloon was not called the Shamburg & Cory saloon; he answered, " Yes, I believe so." To the question what they, deceased and Stone, were doing there, he said " They had been throwing dice with the bar-tender, that they were throwing for the whisky or something." He stated that he didn't think Mr. Stone drank beer; couldn't say what Chope drank, but to the question "Did they take the drinks?" he answered, " Yes, I believe they did; they throwed again and Mr. Stone got beat again. " Q. Then what did they do? A. They drank again, they then quit throwing. This the witness stated was the "West" saloon. To the question, " Did you see them before that?" he answered, " Yes, I did, they came out of Scott's saloon and went to Reed's saloon; don't know how long they were in Scott & Gorman's saloon ; don't know when they went in; I saw them come out." To the question, " How many times did they drink in Shamburg's saloon while

you were there?" the witness answered, "To the best of my recollection the young man drank three times, and the old man twice." To the question "Did you know what he drank each time?" he answered, "I couldn't say ; they got the liquor of Mr. Reed ; Reed was the bar-tender."

The witness William Kallen testified that he saw Chope and Stone on the 30th day of December, 1887, in what was known as Reed's saloon. To the question, "The old Cory & Shamburg saloon?" he answered, Yes, sir." To the question, "What did you see them do there?" he said, "He saw them at the bar taking drinks."

Q. Was this man Chope drinking?

A. Yes, sir.

Q. What kind of drinks?

A. I don't know.

Q. What kind of a glass?

A. A small glass.

Q. Larger or smaller than a whisky glass?

A. About the size of a whisky glass.

Q. Saw him take it off of the bar and drink it?

A. Yes, sir.

A. Norman was sworn and examined as a witness on the part of the plaintiff, and testified that he resides at Ord ; is also acquainted with the plaintiff and is one of her attorneys ; is also acquainted with the defendants R. M. Scott, Gorman, Cory & Shamburg, Hall, and Wall ; is one of the attorneys in this case ; that he has made an examination and search for the saloon bonds given by the defendants ; that the examination he made was just a few days prior to the commencement of this action ; that he went to Arcadia for the purpose of getting the bonds or copies of them ; that he went to the party, Mr. Hall, supposing he was the clerk, but that he informed witness that he was not the clerk at that time, that he had resigned. This Mr. Hall is Edgar L. Hall, one of the parties to this suit ; that Hall told witness that Mr. Rhittenmeyer (Christian name

not remembered) was his successor; witness went to see
Mr. Rhittenmeyer, but didn't find him; that then Mr.
Hall told witness that the clerk didn't have the bonds;
that the new clerk never had had the bonds; that when he
resigned he turned the bonds over to Mr. Hastings, the
treasurer; that after some little talk, he told witness, "that
the boys were damn fools, or words to that effect, trying to
play the bonds were gone." He says, "the bonds are here
now and they are all right and are good bonds, and he
says Mr. Hastings has the bonds and you go up there and
tell him you want to see the bonds and you will get them."
I asked him if he knew who the bondsmen were, and he
said he did; he said, I am one of the bondsmen and the
saloon-keepers are on each other's bonds. He went ahead
and told me that Gorman was on Cory & Shamburg's
bond, and Cory on Gorman's bond, and he told me he and
Cory were on Scott & Gorman's bond, and John Wall and
Scott were on Cory & Shamburg's bond. He said he and
Cory were on the bond of Scott & Gorman. He further
stated that he had quite a long talk with Mr. Hall, quite
late; that he left there and didn't go to Mr. Hastings' that
night; thinks that Mr. Hastings' store was closed.

This witness, upon being recalled for further examina-
tion, stated: "The next morning after I had the conversa-
tion with Mr. Hall I went to see Mr. Hastings and de-
manded the bonds. He informed me he had had the
custody of the bonds; he said he would search. He took
out some papers and pretended to make a search, and said
they are not there. He said first one of the 'boys' and
then another would come and take out the bonds and he
didn't know who had them. And after that I went to see
this man Rhittenmeyer, village clerk, in company with Mr.
Babcock that was along; it was quite a while after that,
immediately after the December term of court, I don't
remember exactly the time. We went to the office of
the village clerk and demanded the bonds, and also ex-

amined the village clerk's record at that time of the approval of the bonds.   He said he had never had the bonds.
He said he didn't have the bonds—he had never seen the
bonds.   I did see the records; there was a record of the
approval of the bonds, but no record of the bonds proper;
only the approval of the bonds, at least I didn't see any."
Witness is asked the question, "State what talk you had,
if any, with Mr. Hall in reference to the signatures on the
bond he signed."   Over objection by the defendant which
was overruled by the court, the witness answered, "I had
a conversation, as I stated before, with Mr. Hall at Arcadia, in his drug store, in which he told me the names on
the bonds; told me he and Mr. J. G. Cory were on the
bond of Scott & Gorman, and he said Mr. Wall and Mr.
Scott were on the bond of Cory & Shamburg, John
Wall."

Upon cross-examination by counsel for defendants, this
witness stated that he had an interest in the verdict in this
case, the same as any attorney; that his interest was to the
extent of his fees; that there was no stated contract between him and the plaintiff; that she said she had no
money to prosecute the case, and she said she couldn't pay
me any money, and she didn't know whether she would
have enough to carry the case through or not; "and we
talked the matter over, and talked about my taking the
case and paying expenses and other counsel and taking
half.   There was no definite agreement as to what I was to
get.   I don't consider there was any binding contract one
way or the other."

John Wall was called and sworn for the plaintiff.
Stated that he was the party mentioned in the subpœna,
Exhibit "C"; that he is the party that produced "those
records before the court under that subpœna and brought
the books to court here."   To the question, "How did
you get them?" he answered, "They were in my office;
as commanded by the subpœna I brought them over."

By the court: How did you come into possession of these books?

A. The village clerk was a partner of mine and in my office, and when he left, these books were left there.

Q. Did you know whether or not his successor has been appointed?

A. I do not.

Q. Has any one assumed authority as clerk on behalf of the village of Arcadia to take the records from your office?

A. They have not.

Q. They have been under your control since the clerk left them there, so that they were in the same condition as when he left them?

A. I was in the office and paid no attention to them. When I got the subpœna I went to the drawer and found the books there.

Q. Was the office of the village clerk in your office?

A. Yes, sir.

Q. That was his place of transacting business for the board?

A. Yes, sir.

By Mr. Robbins: Have you ever examined these records and papers?

A. Only in part.

Q. Do you know whether the bond of Scott & Gorman for 1887, and Cory & Shamburg for the same year (liquor bonds) are contained in these records?

A. I don't.

Q. Will you examine the records and ascertain?

A. I don't find them here.

Q. Do you know whether or not this record contains a record of the bonds?

A. I do not.

S. A. Hawthorne was sworn and examined as a witness on the part of the plaintiff. Resides at Arcadia, Valley

county; resided there in 1887 and was one of the town board; knows that there were saloons opened under witness's administration in the year 1887; licenses taken out by two saloons that year; thinks licenses were issued in the names of Cory & Shamburg and Scott &· Gorman; don't think there were any others; don't think there were any other parties licensed that year; one of the licenses was taken out when witness was not present, but don't think there was any but those two taken out that year; as a member of the town board witness would have known it if there had been; when the petition in one case was presented to the town board it was at Owens's harness shop; witness couldn't tell which bond or petition it was; George Cory's, one of the defendants in the case, name was on it.

Upon the cross-examination he stated that he didn't know whether his name was on the bond or on the petition; didn't know which it was; don't know whose bond or petition he signed; there was a record kept of it and that record isn't here; don't know where the record is; I think he took the record and skipped because his name was on the bond or petition, whatever that was.

Upon redirect examination, this witness stated that he remembers the conversation that took place at the time of the presenting of this bond, upon which Cory's name was as surety, in which witness told the balance of the board that he considered Cory's name good for the whole business.

On recross-examination he stated that this conversation was with Bert Charlton or Ed. Fuller; Ed. was chairman. That witness considered George Cory's name good for the necessary amount involved in the transaction, whether on bond or petition.

A. E. Charlton, a witness for the plaintiff, testified that he was a resident of Valley county; resides at Arcadia; resided there in 1887; was cashier of the First National Bank; in 1887 was on the village board; was present at

some of the meetings of the board; sometimes he was not present; that there were two saloon licenses granted about the 1st of May, 1887; they were issued respectively to Scott & Gorman and Cory & Shamburg; don't know that any other licenses were issued, but would know if there had been; supposes that the firms that got the licenses gave bonds; is satisfied in his own mind that both firms did; the minutes of the meeting show that I was present when the bond of Scott & Gorman was approved; don't believe the licenses specified what buildings these two firms were licensed to sell liquor in; Scott & Gorman commenced selling liquor in the building where Jamieson has his saloon now; Cory & Shamburg were where the meat shop is now, one building between the two buildings; Scott & Gorman's is farthest east and Cory & Shamburg's farthest west; don't know whether John Wall's name was on either of the bonds or not, neither can he swear whether J. G. Cory's name was on either of the bonds; don't know whether Scott & Gorman were on Cory's bond, and don't know whether Cory was on Scott & Gorman's bond; neither does he know whether Wall was on Scott's bond; nor whether Wall was on Cory's bond.

Q. Was he on one of the bonds?

A. Mr. Hall told me he was on Shamburg's bond; from my own recollection I couldn't say whether he was or not. After the suit was commenced I went to his drug store to get some medicine and he told me he was on the bond but he didn't say which one he was on, and I never asked him.

Upon cross-examination, this witness testified that his place of business was just across the street from where these saloons were opened; remembered the two buildings they were opened in; that the Cory & Shamburg saloon was moved out of the building in which it was opened to the building on the east; couldn't say who moved it; couldn't say whether it was moved by one Reed or not; couldn't tell when it was moved; should judge it was

along in the after part of the summer—possibly the fore part of the fall; couldn't say that he remembered when Cory & Shamburg stopped selling liquor; knew that they dissolved partnership but couldn't state when; if he remembers aright, it was in the fall or after part of the summer.

Upon redirect examination, this witness stated that he had been a member of the board ever since he came to Arcadia until this last election this year. He was then asked the question whether, as a member of the board, he ever knew of a saloon running there in Arcadia without any license.

Question by the court: Are you able to answer it yes or no?

A. I can't answer it yes or no, I will have to explain. I was told that a man—I was satisfied in my own mind that a man by the name of Reed had bought it and was running it without license.

Q. He had bought into what saloon?

A. In the first place he bought of Shamburg; that was the original Cory & Shamburg saloon he bought into.

Q. He ran that saloon, did he?

A. Yes, sir.

Q. Was that license you ordered issued to Cory & Shamburg, was that ever returned to the board and canceled?

A. Not that I recollect.

Q. As a member of the board, would you know if that license had ever been returned?

A. If I was present when returned I would be. If it had been returned when I was not there, very likely I would not know anything about it, our clerk's records ought to show it but I don't know whether it would or not.

Upon recross-examination he stated our clerk was very careless about keeping the record.

Q. Where is your clerk?

A. He is gone.

Q. When did he leave Arcadia?

A. He left last summer.

On redirect examination this witness stated that he never heard of this license having been returned to the board.

W. S. Owens was called as a witness on the part of the plaintiff. Stated that he resides in Arcadia; business was that of a harness-maker; had lived there four years this spring; was one of the town board; was on the town board from the time the town was first incorporated until the year 1887; was a member of the town board the first of May, 1887, and until that time in 1888; that Cory & Shamburg as one firm and Scott & Gorman as another firm were licensed during the year 1887 or 1888, witness wouldn't be positive which; the time they were licensed witness was a member of the town board; there was no others issued after that that witness knows of; couldn't tell who were the bondsmen on either of the bonds. To the question, "Was John Wall one of the bondsmen?" he answered, "I don't know for certain; I hardly think he was; I think he was objected to, whoever the parties were—the parties giving it; I think John Wall was objected to, as he was on some other bonds." To the question, "Was J. G. Cory on one of those bonds?" he answered, "He was an applicant." To the question repeated he stated, "I can't tell you; I suppose—." To the direct question, "Wasn't J. G. Cory one of the bondsmen for Scott & Gorman?" he answered, "I couldn't tell you; I don't recollect who the bondsmen were; I wouldn't swear that he was or was not; I have no recollection about it." To the question, "Was R. M. Scott one of the bondsmen for Cory & Shamburg?" he answered, "I couldn't tell you that." The same answer as to John Gorman, whether he was bondsman for Cory & Shamburg. To the question, "Was Edgar L. Hall one of the bondsmen for Shamburg & Cory?" he answered, "I think Edgar L. Hall told me

one time he was on one of the bonds." To the question, " Was John Wall one of the bondsmen for Shamburg & Cory ? " he answered, " I couldn't tell you." To the question, "Do you swear he wasn't ?" he says, " I couldn't tell you." Does not recollect of being present at the time of the approval of the bond of Scott & Gorman ; has no recollection of the approval of any bonds; don't know of any bonds being given ; I think we issued two licenses, Scott & Gorman's and Cory & Shamburg's.

Upon cross-examination he stated that there was one time that was brought up, he, John Wall, was objected to and they were required to get somebody else.

Q. Don't you remember it was because Wall was on the treasurer's bond of the village?

A. I don't think it was a liquor bond.

Certain pages of the minute book of the village of Arcadia for the year 1887 were offered and received in evidence, showing that at a regular meeting held on the 2d day of May, 1887, there were present, Owen, Hawthorn, Hastings, Charlton. Fuller in the chair. The minutes of last meeting were read and approved. Application of Cory & Shamburg for saloon license for the year ending the first. Tuesday in May, 1888, accompanied by bond and petition. Motion by Charlton that bond be accepted, and the clerk be instructed to issue license when the money is paid into the treasury. Carried, etc. Attest, E. L. Hall, clerk. Also of the regular meeting of said board on the 20th day of May, 1887. Present, Owen, Hastings, Fuller. Fuller in the chair. After other business application of Scott & Gorman, accompanied by bond and petition, for saloon license. On motion of Mr. Charlton, the bond is approved and the clerk ordered to issue the license when $750 is paid into the village treasury. After other business adjourned. Attest, E. L. Hall, village clerk.

Frank Moses was called as a witness on the part of the defense. Stated that he had met the deceased to know him

three times; that he saw his body after his death; first saw it at Cummings' shanty; that he acted as one of the coroner's jury at the inquest held upon his dead body; that he had known the witness Stone for about five years; lived in the same neighborhood with him; heard his testimony at the coroner's inquest; that he stated in his testimony as to the amount of liquor drank by the deceased; that it was one glass of beer and two of whisky, or it might have been one of whisky and two of beer; that that was all that he (witness Stone) knew of the man drinking, if he drank any more he didn't see him do it; that he (witness) examined the dead body of the deceased at the time of the inquest; that the body was stripped and examined, and it was found that his chest here (indicating) not frozen; his right arm we could raise it so, like that (indicating), and this arm (indicating) was just in this shape (indicating), and his teeth set perfectly tight; that while witness might have been mistaken as to the exact spot, "we found, I think, on the left of the back bone, pretty near the shoulder blade, a spot, as near as I can remember, the size of a silver dollar, dark purple; I called the attention of the doctor to it, and he said it was undoubtedly caused by tipping over. Then we found a mark on the right eye, this bone (indicating), so I took two nails out of my pocket and placed it right down in there. I wasn't satisfied with that and I called in witnesses who knew the gentleman before to see if it was natural. We then found a scar, I won't be positive which side it was on, I think the left side, laying, I should judge in that shape, a little scar about as wide as my two fingers, which was not colored at all, and those who knew him before said it wasn't natural at all; this was in the left ear. That is all the marks we found on him, except his overcoat was badly torn on the back. There was ice in his hand so that I could take the arm and shake it. I asked the doctor if I could dig it out; and there was ice in both ears, and we dug it out. There was

Scott v. Chope.

ice over his face three-quarters of an inch thick. I believe that is all I can recollect." That the witness George Stone testified that he took his feet and kicked snow in the poor fellow's face, "I asked him what he did that for," and he told me "to keep the wind out of his face." He claimed he took the cap because he had not been—what excuse he gave for it I don't remember; I know we blamed him at the time, and he said he was sorry he did it, it wouldn't do him any more good, the witness was bareheaded himself, and he took it. He said when he left him he was past all help, he spoke to him and he didn't answer. I believe that is all about his being dead. Some of them asked him when he left him (whether he left him), and he said he was past all help; he spoke to him and he didn't answer. I don't remember whether he said he was dead or wasn't dead; he said he was past all help.

This witness further testified that he saw the witness Stone and deceased at Arcadia on the 30th of December, 1887; that he spoke to and shook hands with them and spoke to them about going home; one of them said "All right, we will go in a few minutes." That witness didn't suppose he had been "drinking a drop."

There was some evidence given by the other witnesses, of the marks appearing on the person of the deceased at the time of the inquest, and which is not deemed necessary to copy here.

William Cory was sworn and examined as a witness for the defense. Stated that he was one of the defendants in the case; resides in Arcadia; had lived there about a year; resided in Valley county since 1883; was engaged in keeping a butcher shop; in the months of May and June, 1887, he was a partner in a saloon in Arcadia; that his partner was William Shamburg; the style of the firm was Shamburg & Cory; continued in the saloon business under the partnership of Shamburg & Cory from the 3d or 4th day of May until the 6th of July of the same year,

then sold his business to Shamburg and witness went on a farm; that he lived on a farm all the time; didn't move into Arcadia at the time; about the month of August, William Shamburg informed him (witness) that he had sold the saloon business to Mr. Clark; that witness objected to Mr. Clark running the saloon under that license; that Mr. Clark came to witness and wanted to know if he couldn't run and I said "No;" Mr. Shamburg took said license down from the wall and said he didn't care, and handed it to me and I took that to Mr. Hall, and told him I wouldn't allow that man to run a saloon under my license; I gave it to Mr. Hall and told him to cancel it; Mr. Hall was at that time clerk of the villiage of Arcadia; that he don't know where Hall is now; that witness is acquainted with George Stone, one of the witnesses who testfied in this case, or rather had seen him, was not acquainted with him; never saw William Chope, the deceased, in his lifetime; that he didn't sell any liquor to George Stone or William Chope on the 30th day of December, 1887; that he was not engaged in the saloon business or otherwise at that time; that he had no interest in any saloon or in the saloon he had formerly been connected with in the village of Arcadia on the 30th of December, 1887; that he knows only by hearsay that after Clark's administration of the saloon, the saloon was sold to and run by a man by the name of Reed; don't know his Christian name; don't know when Reed took possession; that he continued to occupy the building until the first of March, 1888; that himself and Shamburg dissolved partnership and published a notice of dissolution in the Arcadia *Courier;* the notice was published for four or five issues; that the firm was dissolved on the 6th of July, 1887; that his last connection with the business was on the 6th of July, 1887.

Upon cross-examination, among other things, witness testified that his partner, Shamburg, as consideration for the said saloon business, gave him a pair of mules—

"he gave me the mules and I left him have what there was."

Q. The license money and everything else?

A. Yes, sir.

Q. And Shamburg continued to run right along under the old license?

A. He did right along until August.

Q. And you knew he was running along under the old license?

A. I knew he was running. ·

Q. Whereabouts did he run?

A. Shamburg continued to run in the same building; the buildings were changed afterwards. I don't know when they changed. I suppose I could find out.

That witness never took the license to the board while in session; never requested the board of trustees of the village of Arcadia while in session to cancel the license.

Q. How far did they move that saloon?

A. In the same block.

Q. I will ask you if it was not right out of one room into another in the same building?

A. Yes, sir.

William Shamburg was called and sworn on the part of the defense. Resides at Ashton, Custer county; had lived in Valley county, at North Loup and Arcadia; that he did a saloon business in the village of Arcadia from the first of May to the middle of October; was in partnership with John G. Cory; the style of the firm he didn't remember, whether it was Shamburg & Cory or Cory & Shamburg; the partnership was formed the first of May; formed to keep a saloon in Arcadia; the partnership continued until sometime after the 4th of July when they quit and witness ran on himself; ran a couple of months, along there. He then sold it to William Clark and was to get $800; took a farm as part consideration from Clark for the saloon; Clark continued to operate the saloon about six weeks then Mr. Reed took it—took it from Clark; Mr. Reed

came up there, the saloon was closed, wasn't running, and he came to me and asked me if I owned the saloon, and I made arrangements with Mr. Clark and Mr. Reed so Mr. Reed got the stuff. It was close to ten days or two weeks when the transfer was made. I got the consideration from Reed; I got four horses, two buggies, and two sets of harness and Mr. Clark got the colt.

Q. What, if anything, was done with the license that had been issued to the firm of Shamburg & Cory?

A. Cory came in there and he was tearing around about the license, and I gave it to him; Cory started to take it down to Hall; Hall was one of the town officers; don't know what town office he held. The partnership formed between Shamburg & Cory was dissolved some time in July, after the 4th; it was dissolved by mutual agreement, and a notice of the dissolution was published in the Arcadia *Courier;* don't know for how long; Cory got it put in the paper; that he was not keeping a saloon in the month of December, 1887; didn't sell any liquors to William Chope, the deceased, husband to the plaintiff in this case, in the month of December, 1887; had no interest in the saloon that Shamburg & Cory had formerly kept at that time. After the selling by witness to Reed of the saloon and fixtures, the stuff was put in the other building —the east building—by Mr. Reed. I think it was moved the time of the fair in Loup; can't remember the day and date; it was in the fall of 1887.

Upon cross-examination this witness stated that he never went to the village board of trustees while they were in session and asked to have the license canceled.

C. D. Crane was sworn and examined as a witness for the defense, and stated that he was the publisher of the Arcadia *Courier,* and that he had in his possession and presented to the court a copy of that paper published in the months of July and August of that year. A copy of the notice was introduced and put in the record as an exhibit.

John Wall was called and examined as a witness on the part of the defense. Among other things, not deemed necessary to introduce here, witness testified as follows:

Q. You may now state, Mr. Wall, whether or not you signed the bond of Shamburg & Cory sued on in this case.

A. I have no recollection of signing the bond for Shamburg & Cory or for Scott.

Q. Do you know anything about the closing up of Clark's saloon while Clark was running it?

A. I do.

Q. State what you know about that fact, Mr. Wall.

A. I had a bill from some eastern firm, I don't know what firm, for collection against Clark; I went down and closed Mr. Clark up, and I was going to attach the stuff— Mr. Clark turned over the keys and I locked up the building and kept it locked about six weeks.

Q. State what happened after that.

A. Mr. Shamburg and Reed made a deal and in that deal my money was paid to me, I think. Mr. Reed and Shamburg were together when it was paid in my office. Clark and Shamburg came to me. Mr. Clark had bought Mr. Shamburg out; I drew the notes and a deed Mr. Clark had, a deed from Mrs. Nelson to him. He wanted to transfer that to Mr. Shamburg in such a way that Clark would not be liable. I went with Mr. Clark over to Mrs. Nelson's and had the deed made direct to Shamburg, the same deed offered in evidence to-day.

Q. State what followed after that, who ran the saloon and how long they run it.

A. Mr. Reed ran it from that time until the next spring.

Q. Whereabouts did he run it?

A. He moved it out of the building; there were two buildings, one built up beside the other, and he moved it over from the one to the other, one building further east than the other.

A. A. Laverty was called and examined as a witness

for the defense.  He is county judge of Valley county;
has some of his dockets with him; has the files of the case
of the State of Nebraska against Charles Reed.   (Defend-
ant here placed in evidence a certified copy of page 4 of
the criminal docket, number 1, county judge's office,
county of Valley.)   It is here admitted that the Charles
Reed referred to in the complaint and record read is the
same Charles Reed referred to in the testimony of Will-
iam Shamburg, John Wall, and Mr. Cory as keeping the
saloon in Arcadia.   The papers referred to appeared in the
transcript as an exhibit, and consists of the information of
of R. C. Nicholls against Charles Reed as a vendor of
malt, spirituous, and vinous liquors, etc., having unlaw-
fully kept the windows and doors of his place of business
obstructed by certain articles known as curtains; the war-
rant for the arrest of Charles Reed, and the docket entry
contained the plea of guilty of Charles Reed to the com-
plaint and his conviction of the offense charged, and the
assessment of a fine of $25 and costs or five days against
Charles Reed.

R. M. Scott was called and examined as witness for de-
fense.   Testified that he resides in Arcadia and had lived
there about four years; that his business is real estate and
insurance; that in 1887 he was in the saloon business in
partnership with J. G. Gorman; the style of the firm was
Scott & Gorman; that he is not acquainted with the wit-
ness George Stone, but has seen him a few times; never
saw the deceased, William Chope, in his lifetime; that on
the 30th day of December, 1887, he did not sell any
liquors to either George Stone or William Chope; that up
to 2 o'clock, or about that time, he was in the back part of
his saloon in the back room; that A. B. Jamieson was
barkeeper at the time; that his partner is now in Wash-
ington territory; witness heard the testimony of Mr. Nor-
man, one of the attorneys for the plaintiff in this case, in
regard to witness being on the saloon bond of Shamburg

& Cory; that to witness's recollection he never signed said bond; that they asked him to, and that he told them he was going into the same business and couldn't sign it; don't recollect which one asked him; don't know much about the sale of the saloon owned by Shamburg & Cory; that Reed told him one day he was going into the saloon business next day, and that he did go into the saloon business the next day and continued in it until the first day of the following May; that he moved the saloon formerly occupied by Cory & Shamburg; Cory wasn't there after the first part of July, and Shamburg left afterwards; that Shamburg sold his interest to Reed for some horses and buggies.

A. B. Jamieson was called and examined as a witness on the part of the defendants. Stated that he lived in Arcadia; had resided there for the last five years, and was at the present time assessor of the township; was a single man; was engaged in the saloon business in the month of December, 1887; was tending bar for Scott & Gorman in Arcadia; had seen the witness George Stone; had also seen William Chope, the deceased; first saw them in Scott & Gorman's saloon on the 30th day of December, 1887, at between 1 and 2 o'clock in the afternoon. Witness was at that time tending bar; besides them and himself there were in the saloon at that time Mr. Gorman, Mr. Scott, Mr. McCord, John Reed, and several others whom the witness cannot remember at this time. Chope and Stone came into the saloon. Chope came in first; Mr. Chope went into the office inside of the saloon on the west side; the office is about twelve feet north and south and eight feet east and west, and at that time Mr. Gorman was sitting in the office when these two strangers came in ; the first time witness ever saw either of them; that the younger of the two walked up to the railing and entered into a conversation with Mr. Gorman ; witness didn't hear what he said, then being waiting on people; he then went towards the

south end of the bar and heard them talking something
about renting a piece of land, or selling it; witness didn't
pay any attention to that because Mr. Gorman had been
wanting to sell his farm ever since he had been in the
business, over a year; that they talked there probably
twenty minutes to half an hour, and both men went out,
and witness didn't see them again, either of them; that
the farm Gorman referred to, is about four miles north of
Arcadia; witness don't know how far from Stone's house,
as he don't know where Stone lived; that neither one took
a drink in that saloon that day; they were in there but
once; that witness heard of the death of Mr. Chope the
day following; heard it from Mr. Gorman.

The first four paragraphs of the instruction given by the
court on its own motion are unexcepted to and therefore
are not copied here. The remaining five which were ex-
cepted to by the defendants I copy here:

"5. You are instructed that if from the evidence you
should find that the deceased, William Chope, came to his
death by freezing, or by other means, on the night of De-
cember 30, 1887, and that such death was caused or con-
tributed to in any manner by intoxicating liquors, and that
any of the defendants, personally or through their agents,
furnished him any intoxicating liquors on that day which
contributed to such result, then, and in that case, all the de-
fendants furnishing intoxicating liquors would be jointly
liable in damages to the plaintiff; and if you further find
that any of the defendants sued as bondsmen were upon
the bonds of the parties so furnishing, then, and in that
case, such bondsmen would be jointly liable.

"6. You are further instructed that if you should find
from the evidence that the deceased came to his death by
violence inflicted by any other person, and should further
find that the person inflicting the violence was intoxicated
at the time and that he obtained the liquors which caused
his intoxication from the defendants, or either of them,

and that he would not have used the violence that caused the death except as a result of such intoxication, then, and in that case, such of the defendants and their bondsmen as furnished such intoxicating liquors would be equally liable.

"7. You are instructed that an individual or partnership taking out a license for the sale of intoxicating liquors cannot sell and transfer that license to another person or party; and if they do sell and transfer their business, together with their rights under the license, the purchaser would be holden to be their agent and they would be liable for all sales made by him under and by virtue of license. And if the bondsmen of such license-holder knew of such sale and transfer and take no steps to relieve themselves from liability, their liability will continue.

"8. You are further instructed that it would be the duty of a person going out of the saloon business, selling and transferring his property, to return his license under which he was transacting business to the authority granting the license and have the same canceled, and if he did not do this, that he would be held liable for all damages accruing as the result of the sales of intoxicating liquors by his successor in business.

"9. You are instructed that the amount of a sale is not material, nor is it material that the sale should be the one which produced the final intoxication; but the saloon-keeper or the person furnishing intoxicating liquors is responsible for all damages which may accrue as the result of his sales, if a person obtains but one drink and then drinks at other places sufficient to intoxicate him. And if the death is established as a result of sales by more than one person, you are not required to find which one furnished the liquor that caused the death."

The three paragraphs of instruction given by the court at the request of the plaintiff, to which the defendants excepted, are as follows:

"1. The jury are instructed that every material allegation in the petition not controverted and denied in the answer are to be taken as true; and further, that the allegation in the petition that the defendant John G. Cory signed the bond of Scott & Gorman is not controverted or denied in the answer, and therefore is to be taken as true.

"2. The court instructs the jury that if from the evidence they believe that the said William Chope was, at the time he upset and overturned his sled and lost his team, intoxicated, and that the defendants sold any part of the liquors that produced such intoxication, and that he upset his sled and lost his team in consequence of such intoxication, and that in endeavoring to reach home on foot became exhausted, and that such exhaustion was caused by reason of his being compelled to walk, and that he was unable to reach home and was frozen to death, the defendants would be liable.

"3. You are instructed that whatever the fatal cause was of the death of the said William Chope, if it was inspired or contributed to by the state of intoxication caused in whole or in part by said traffic of the defendants and the sale or giving to the said William Chope intoxicating liquors, then the defendants would be liable."

The following four paragraphs of instruction asked for by defendants and refused by the court, and such refusal excepted to by the defendants, are as follows:

"1. The jury are instructed that in order to justify a verdict for the plaintiff against any of the defendants, they must first find that the death of William Chope was caused by the drinking of the liquors furnished by the defendants or some of them, but if you find that whisky was furnished by more than one defendant, you are not required to find which one furnished the liquors that caused the death.

"2. You are further instructed that a party who procures a license to sell liquors may cease selling at any time

he may choose to do so, and sell his liquors or saloon furniture to any person he may choose, and that he is under no legal or moral obligation to see to it that the purchaser thereafter complies with the law and procures a license any more than any other citizen, and that if such a party does cease selling, neither he nor his bondsmen can be held liable for any act or default of the person who thereafter operates such saloon.

"3. You are instructed that if you find that Cory & Shamburg dissolved their partnership in good faith, one of them retiring, that such dissolution would relieve the bondsmen of the firm of Cory & Shamburg from further liability for the partner remaining in business unless such bondsmen consented thereto and new license was procured.

"4. The jury are also instructed that bondsmen of persons engaged in selling liquors are under no more obligation than any other citizen to see that purchasers from his principal comply with the law and procure a new license or give new bonds."

It appears from the record that at the close of the trial the court directed the jury that as he was about to adjourn court until the following morning, it being then late in the night, that should they agree upon a verdict at any time during the night, that their foreman should sign such verdict and seal it up in the envelope which the court then handed to them, he first signing such verdict in their presence, and take it into his custody; that they then could separate and come in a body into court at 9 o'clock the next morning. The court also admonished the jury that a verdict of agreeing not to agree is not a verdict; that they must first agree upon a verdict as to the merits before they would be allowed to separate; that the jury then retired in charge of the sheriff, and on the 18th day of June, 1889, the day following, said jury came into court in a body with their sealed verdict in words and figures as follows, to-wit:

" We, the jury sworn and impaneled in the above enti-tled cause, do find for the plaintiff, against the defendants R. M. Scott, John G. Cory, John Gorman, and William Shamburg in the sum of $6,000, and against John Wall and Edgar L. Hall in the sum of $1,000, jointly with the above defendants."

Whereupon the court refused to receive said verdict but directed the jurors to retire and reform their said verdict, at the same time instructing the jury as follows:

"In this case, if the defendants Wall and Hall are lia-ble at all, they are liable as bondsmen, and if their princi-pals are liable in an amount equal to or greater than the amount of the bond, $5,000, then their bondsmen would be liable in the amount of $5,000 or not at all, so you will return and reform your verdict."

To which instruction the defendants then and there ex-cepted. Thereupon the jury again retired to reform their verdict. And afterwards the following questions by the jury, marked Exhibit "D," were handed the court by the officer in charge:

" To the Hon. Judge: It we find the damages $7,000, and put the $7,000 against R. M. Scott, John G. Gorman, John G. Cory, and William Shamburg, and $5,000 against John Wall and Edgar L. Hall, will that be right?"

Whereupon the jury was again called and instructed by the court as follows:

" This verdict, gentlemen of the jury, was returned to you for the purpose of having you make corrections in it so that it could conform to the law. I don't know what you mean by this question unless you have in your minds the idea that the sum total of the two findings would be the judgment. That is not the law. Each one of these parties, if liable at all, or any of them are liable for the whole amount of the verdict that would be the judgment, except the bondsmen, cannot be found liable for an amount in excess of the conditions of the bond. If there was a

bond given for $5,000 they cannot be found liable for a greater amount than that, but if you find the principals to be liable for damages equal to or in excess of the $5,000, then the bondsmen are with them jointly liable to the amount of $5,000. In reforming your verdict, the amount you find as damages against the principals needed no change whatever, it simply needed changing as to the bondsmen, who, if they were liable at all, were liable to the full amount of their bond for $5,000. But I could not, and would not render a judgment for the sum of the two findings. Your first finding needs no change under the instruction of the court, but the last finding should be made to conform to the first. It is not the total of the two. The question was presented to you as to whether or not the defendants Wall and Hall had signed any bond under which damages had been incurred. If you find that they signed a bond and that damages have been sustained, and that the damages as far as the principals for whom they signed amounted to $5,000 or more, then they were liable for $5,000 or not at all.

"Question by juror: If we change the $1,000 to $5,000 will that be correct?

"Answer by the court: Yes.

"The above instruction marked No. 'B' was given after the jury had been called into court subsequent to their being sent out to reform their verdict. The jury having sent to the court the written request attached hereto and marked Exhibit 'D.'        F. B. TIFFANY, *Judge*."

"And now on the 18th day of June the jury returns into open court their verdict as follows:

"In the District Court in and for Valley County, Nebraska.

"EMMA CHOPE
v.
R. M. SCOTT, JOHN G. GORMAN, JOHN G. CORY, WILLIAM SHAMBURG, JOHN WALL, AND EDGAR L. HALL.

"We the jury sworn and impaneled in the above enti-

tled cause do find for the plaintiff and against the defendants R. M. Scott, John G. Cory, John C. Gorman, and William Shamburg in the sum of $7,000, and against John Wall and Edgar L. Hall in the sum of $5,000 jointly with the above defendants.

"J. V. JOHNSON,<br>"Foreman."

The following examinations of the juror Timmerman is here copied from the bill of exceptions:

Juror Timmerman challenged by defense. Examined by the court.

Q. Have you any bias or prejudice against the saloon business, or against men engaged in that business in any capacity, as would preclude your giving their testimony the same weight and consideration as you would the same men if they were engaged in other business?

A. No, sir.

Q. Have you any bias or prejudice against the business or men engaged in it so that you could not give to their testimony due consideration and weight, the same as you would any other men?

A. No, sir.

Q. Would you pass upon their testimony, considering only whatever interest they might have in the result of the suit or relationship to the parties the same as you would any other witness?

A. Yes, sir.

ABBOTT: Q. I believe you said at the time you read this article you saw in the paper you had never heard it disputed, the facts as you saw them there?

A. No, sir.

Q. Did this article you saw in the paper tell the facts and circumstances with the names and date?

A. I don't know as it stated the whole facts. I think it stated the cause of his death from liquor or something of the kind.

Q. You believed the reports as you read them?

A. I naturally would.

Q. If this action brought to recover for the death of the man and the reports are true, then you had an opinion as to which party ought to recover?

A. Yes, sir.

Q. And it would take a little evidence to get it out of your mind wouldn't it? Can you get it out of your mind enough to be able to start even?

A. I don't think I would be prejudiced.

Q. I want to take the case as it stands to-day; you believed it then, never heard it disputed, wouldn't it take some evidence to make you believe the other way.

COURT: Q. Do you know anything about the facts except that what you read in the newspaper?

A. No, sir.

Q. From what you read in the newspaper did you form or express any opinion as to whether or not the plaintiff in this case ought to recover, and if so, how much?

A. No, sir.

Q. Have you any opinion now as to whether she should recover?

A. I don't know but what I would have.

Q. Is that opinion such a one as would influence you in the jury room after you heard the testimony?

A. No, sir.

Q. You would be able to listen to the testimony as given to the court, and under the instructions of the court render a fair and impartial verdict in the matter?

A. Yes, sir.

Challenged by defense.

Challenge overruled. Defense excepts.

Second juror Timmerman challenged by defense. Examined by Abbott:

Q. Have you any prejudice against men engaged in the business of keeping saloons?

9

A. I look at it like this: if the law gives him the privilege it is an honorable business.

Q. Would you take his word as soon as anybody else's?

A. No, sir.

Q. Are you a member of any organization which has for its object the suppression of the sale of intoxicating liquors?

A. Yes, sir.

Juror challenged by defense.

COURT: Q. Is that organization political in its nature or a secret society?

A. Political.

Q. Would your connection with that organization and your interest in it be such as would prejudice you against a man engaged in the traffic of intoxicating liquors to that extent that you would not give his testimony the same weight as other men?

A. No, sir, it would not.

Q. Would you be able to listen to the testimony upon oath of a man engaged in the liquor traffic, and interested in the result of the suit, and give it the same weight as you would the same man if he was in other business and interested to the same extent?

A. The same weight.

Q. Wouldn't allow the fact of his being engaged in the liquor traffic to influence you?

A. No, sir.

Challenge overruled. Defense excepts.

Neither the first, second, third, fourth, or fifth assignments will be examined specifically. They will doubtless arise in the discussion of other assignments, and, if necessary, attention will be paid to them at the close of this opinion.

The sixth assignment of error is based upon the refusal of the court to give the first, second, and third paragraphs of instruction asked for by the defendants. I confess my

Scott v. Chope.

inability to conceive the reason why the court refused to give the first of this series, unless it was that the substance of it had been already given in those given by the court on its own motion, and it is true that the whole of the substance of said paragraph was given except possibly, the last clause, to the effect, that in a certain event the jury were not required to find which one of the defendants furnished the liquors that caused the death. The refusal to give this clause or sentence by the court was not prejudicial to the defendants. As applicable to the evidence in this case, the second and third paragraphs of this series ought to have been given. The evidence in the case is to the effect that Cory & Shamburg, as copartners, took out a license to sell intoxicating liquors in the village of Arcadia for one year from the first or second of May, 1887; that they continued that business until on or about the sixth day of July, when Cory sold out his interest to Shamburg, which sale, although the evidence is not absolutely clear on that subject, must be held to have been of all his rights and privileges under the license as well as his property interest in the stock in trade and fixtures; that notice of this sale was publicly given and that it was quite generally known in the community. Cory ceased to have any other connection with the business whatever. That after about a month, Shamburg also sold his interest in the property and stock in trade to a Mr. Clark. What the understanding between Shamburg and Clark was, as to whether Clark would have a right to sell intoxicating liquors under the original Cory & Shamburg license, does not appear, but it does appear that Mr. Cory objected to Clark's selling under that license, and upon making his objection known to Shamburg the latter gave up the license and it was carried to the office of the city clerk and given up to him by Mr. Cory. Now there can be no doubt of the right of Cory to sell out his interest in the liquors and other saloon property to Shamburg. Whether he had the right to sell his interest in the

license so as to discharge himself of any liability for the manner in which the saloon business should thereafter be conducted by Shamburg, not being involved in this case, will not be considered, but there can be no doubt that after this sale Shamburg had the right to continue to sell under that license and was responsible for the manner in which he conducted such business, as were also the bondsmen of Cory & Shamburg for the manner in which he conducted that business according to the conditions of the bond. It is equally clear that it was incompetent for Shamburg to sell any right under the license to Mr. Clark, but it is also clear that he did have the right to sell to him the saloon property, etc., formerly held by Cory & Shamburg and Cory's interest in which had been sold to Shamburg. And I am quite satisfied myself that in such case, if the sale was made in good faith and was not colorable, that upon such sale being made, and Clark entering into the possession of the premises, especially when the Cory & Shamburg license was taken down from the wall by Mr. Shamburg and delivered to Mr. Cory, and carried by him and delivered to the village clerk, that all liability of the licensees Cory & Shamburg, or of Shamburg individually, to the public, as to the manner in which the saloon business should be carried on in that place, either by Mr. Clark or anybody else, absolutely ceases. I have read with interest the argument of counsel in which they urge the contrary and claim that the language of our statute at section 5, page 554 of the Statutes of 1889, as follows: "The license shall state the time for which it is granted which shall not exceed one year; the place where the liquor is to be sold, and shall not be transferable;" in effect imposes a kind of legal trust upon the licensee as well as his securities under the liquor law which would render them liable and responsible for the manner in which the saloon business is carried on at the place specified for the entire year. This language of the statute I understand to mean, first, that licenses

shall not be issued for a less time than one year; second, that each license shall clearly designate the place where the authority of selling liquor under it is to be exercised, and thus give no licensed person the right or power to move his saloon from one point to another; and thirdly, that it shall confer no right, power or authority upon any licensed person to sell out his license to another person thereby conferring any right of privilege upon him. It may be granted that where a person licensed to sell intoxicating liquors sells out his saloon property and fixtures to another person and without giving notice to the proper authorities, and especially for the purpose of shielding the persons to whom he sells from the necessity of procuring a license, conceals the fact that there has been a sale and transfer, he would be held liable for the damages caused by the sale or giving away of liquors by his purchaser, but that is not this case.

The court was doubtless right in refusing to give the third paragraph of this series in the shape in which it appears in the record. It is certainly not the law that, upon the dissolution of the partnership of Cory & Shamburg, in ever so good faith, and the retiring of Mr. Cory from the firm, their bondsmen were relieved from further liability for the partner remaining in business unless such bondsmen consented thereto and new license procured, whatever the meaning of the draftsman of that paragraph was.

The fourth assignment of error is based upon the giving of the sixth paragraph of the instructions given by the court upon its own motion. In considering this assignment it will be remembered that the plaintiff, by her petition, alleged that on the 30th or 31st days of December, 1887, the deceased, William Chope, obtained liquors from the defendants, naming the principal defendants and setting out who their bondsmen were, which liquor he drank and thereby became intoxicated, and that in said drunken

and intoxicated state and condition, said William Chope started for his home, and being in such drunken and stupefied condition, was unable to drive his team; that it was in the night-time, the night exceedingly cold and stormy, and by reason of his said condition and the loss of his team, the said William Chope, becoming unable to travel on foot, and hence unable to reach his home or obtain other shelter, froze to death. By the instruction we are now considering, the court tells the jury that if they shall find from the evidence that the deceased came to his death by violence inflicted by any other person, and should further find that the person inflicting the violence was intoxicated at the time, and that he obtained the liquors which caused his intoxication from the defendants, or either of them, and that he would not have used the violence that caused the death except as the result of such intoxication, then the jury should find for the plaintiff and against such of the defendants and their bondsmen as furnished such intoxicating liquors.

Some slight evidence had been introduced on the part of the defendants, the object of which evidently was to disprove the evidence of plaintiff that the deceased, William Chope, came to his death by freezing, caused by exposure and intoxication. It can scarcely be said that this evidence was inadmissible by reason of no foundation having been laid for it in either of the answers. Its object and purpose was not so much to establish a positive theory of the death of Chope, as to disprove and weaken the plaintiff's theory. This evidence, slight as it was, was doubtless conceived by the trial court to be a reason for giving the above instruction. The witness George Stone was the only human being known or believed to have been with the deceased at or near the time of his death. If he received any violent treatment from any human being which could have contributed to his death, it was from Stone. There was evidence in the case, both from Stone himself and many

other witnesses, that he at or about that time was to some extent intoxicated, and that the liquor which produced this intoxication was obtained from the same parties and at the same time that Chope procured the liquor which produced his intoxication.    Now if it was true that after these two men became intoxicated at the saloons in Arcadia, as we have seen, and while in such state of intoxication Stone had set upon Chope and caused his death by violence, it cannot be doubted, under the decisions of this and other courts, that, upon proper allegations and proof, the widow and infant child of Chope would have had the same cause of action against the saloon-keepers, who furnished the intoxicating liquors which intoxicated the one, to a condition causing him to use violence upon his friend and son-in-law, and upon the other sufficient to make him the easy victim of such violence.    Certainly there cannot in view of the case of *McClay v. Worrall*, 18 Neb., 52.

While, as above stated, I do not think the evidence on the part of the defense of any violence to the person of Chope sufficient to render it necessary upon the part of the court to give the said instruction, yet, after having produced the evidence, such as it was, I do not think that the defendants can object to the court having probably misconceived the weight of it and considered it necessary to place it before the jury in the shape of an instruction. Neither can I conceive that it could have misled the jury.

The eighth assignment of error is based upon the giving of the seventh instruction.

The court in this instruction first tells the jury that an individual or partnership having taken out license for the sale of intoxicating liquors, cannot sell and transfer that license to another person or party.    This is clearly correct but the court continues: "And if they do sell and transfer their business, together with their rights under the license, the purchaser would be holden to be their agent and they would be liable for all sales made by them under and by

virtue of such license." This, I think, would depend upon the fact of whether the alleged sale was made openly, honestly, and in good faith, or was merely a colorable transaction for the purpose of carrying on the business and avoiding the responsibility which the law has fixed upon licensed persons. I do not quite agree with the logic contained in the court's expression declaring that a licensed person cannot transfer his license, and again, that if he does transfer it that the person to whom it is transferred becomes his agent. The court continues: "And if the bondsmen of such license holder knew of such sale and transfer and took no steps to relieve themselves from liability, their liability will continue."

It may be sufficient for the purpose of this case to say that, according to the evidence, long before the sale of the liquors which it is claimed caused the death of plaintiff's husband, one of the licenses in the case, and the only one to which the doctrine of the instruction can possibly apply, had been surrendered up to the village authorities.

The ninth assignment arises upon the giving of the eighth paragraph of instruction. All that has been said under the last head in reference to the evidence in the case is equally applicable to this point. I am not prepared to say, nor do I know of any law or authority to the effect that a licensed person desiring to go out of the saloon business and selling and transferring his fixtures and stock in trade to another person, is obliged to return his license under which he was transacting business to the authority granting it and have the same canceled, under the penalty of being liable for all damages accruing as a result of the sale of intoxicating liquors by the person to whom he had sold his saloon property. But doubtless if in such case the sale was merely colorable, and the person selling out knowingly allowed his successor to do business under his license, I think that his liability would continue. The case, however, is entirely hypothetical and not applicable to any view of the evidence in this case.

The tenth assignment arises upon the giving of the fifth paragraph of instructions given by the court at the request of the plaintiff, and the eleventh upon the giving of instruction number six.    These two paragraphs of instructions are neither of them contained in the record, nor is any reference made in any of the briefs to their omission.

The twelfth assignment arises upon the admitting by the court in evidence upon the trial of the minute book and records of the village of Arcadia.   These records show the proceedings of the village board of Arcadia at its meeting held March 20, 1887, showing the amendment of the ordinance for the granting of licenses to sell intoxicating liquors by raising the amount to be paid for such licenses to $750, and providing that no such license should issue in any case until the payment of such sum, whereupon such license should issue to the applicant, to be signed by the chairman and attested by the clerk.   Also showing the application of Scott & Gorman for saloon license accompanied by bond and petition and the approval of the bond and license ordered issued upon the payment of $750. Also the proceedings of said board for May 2, 1887, showing the application of Cory & Shamburg for saloon license for the year ending the first Tuesday of May, 1888, accompanied by bond and petition and approval of such bond and order for the issuing of such license upon the payment of the money into the village treasury.   No reason is suggested why the minute book of records of the village should not be received as evidence of the facts therein stated, and I know of no such reason.

The thirteenth assignment is that the court erred in permitting the jury to return to their room to change their verdict, after having returned a sealed verdict into court, and having separated.

The 14th, 15th, 16th, and 18th assignments are based upon the court's instructing the jury to bring in a sealed verdict and in sending them out again after having sealed

and deposited it in the hands of their foreman and separated for the night.

This action on the part of the court is set out at length in this opinion. While, so far as I am advised either by the briefs of counsel or otherwise, our statute is entirely silent as to the power or duty of the trial court to direct the bringing in of a sealed verdict or its allowing the jury to separate after being sent out to consider their verdict, until they have agreed upon a verdict and delivered it to the court, yet I believe it to be and to have always been the practice of our courts to give such direction and to allow juries thus to separate, and I fail to see that the court in this instance, so far as the directing the jury to seal their verdict, then to separate and come together again at the hour of the meeting of the court on the next day, and bring in their verdict, has departed from the usual practice.

Thompson & Merriam, in their work on Juries, at section 333, say : " Thus it has been often held in civil cases in conformity with what has already been stated, that the fact that the jury separate after having agreed upon their verdict, but before they have delivered it into court, is no ground for a new trial, although it may subject the jurors themselves to punishment;" citing numerous cases. " It equally follows that the judge may permit this to be done, and that he may, if occasion require it, send the jury out with directions to return a sealed verdict to the clerk, and adjourn the court until the next day, or otherwise. Or he may permit them to disperse for dinner and to bring in a sealed verdict after the noon recess;" citing cases.

I am therefore of the opinion that in the absence of a showing that the conduct of the jury under the direction of the court was unfair, or that something occurred tending to prejudice the interest of the losing party, that so far as this action of the court is concerned, it will be justified. I quote the following from the same work at section 336 :

" When a sealed verdict so rendered, on being opened, is found to be informal or defective, the jury cannot be sent out to renew their deliberations upon the main question in controversy, or to make a substantially new verdict; although it is competent for them to retire and amend it in any manner not relating to the main question in controversy; " citing several examples and numerous authorities.

In the work by W. W. Thornton on Juries and Instructions, at section 267, the author says : " The court has the discretion in a civil case to permit the jury to seal up their verdict and separate for the night and deliver it the next morning. If the jury separate, having sealed up their verdict by order of the court and assembled the next morning the verdict is found imperfect, the court may return it to the jury for their reconsideration;" citing three Indiana cases.

The trial court, in taking the action which it did take, doubtless followed the authority of these authors, and so far as I am able to see, followed both their letter and spirit, and as above stated, in the absence of even a suggestion or showing of unfairness or oppression to the losing party, such action will be held free from error.

The direction of the court given to the jury upon sending them out to correct their verdict, to the effect, " That if the defendants Wall and Hall were liable at all they were liable as bondsmen, and that if their principals are liable in an amount equal to or greater than the amount of their bonds ($5,000), then their bondsmen would be liable in the amount of $5,000 or not at all," is not technically a charge or instruction of the court to the jury. It was given by the court apparently as an excuse for the direction which he gave in other words, as we have hereinbefore copied. While as an excuse it probably cannot be justified, yet it contained no error of which any party to this action can take advantage.

No further attention need be given to the 20th, 21st, 22d, or 24th assignments.

The 19th assignment of error is made especially in the name and for the benefit of the defendants John Wall and John G. Cory, and seeks a review of the several assignments involving the instructions given and refused, the giving and refusal of which were excepted to in the name of the defendants. It is upon this assignment that that part of the briefs of plaintiffs in error is based, which urges the court to reconsider the several opinions of this court in which it has been held, in effect: " That a motion for a new trial is indivisible, and when made jointly by two or more parties, if it cannot be allowed as to all, it must be overruled as to all." (*Dutcher v. State*, 16 Neb., 30.) Or as otherwise expressed, " Where in an action against two defendants  *   *   * the evidence is sufficient as to one, but insufficient as to the other defendant, the verdict and judgment being against both, and the one against whom the evidence was insufficient made no motion for a new trial as to himself alone, the judgment will not be disturbed." (*Long & Smith v. Clapp*, 15 Neb., 417.)

I have read with considerable interest the briefs and arguments of counsel, in which they urge that this line of decision should be overruled. It is a question of practice. Were it only the first instance, it is altogether possible that it might be deemed best to establish the practice urged by counsel; but, as counsel seem to admit, the first case in this state in which the point was considered at all was that in which the line of decisions above referred to was started. Upon due consideration, as we then thought of the question, we came to the conclusion that it was more logical, and in a majority of probable cases would be more conducive to justice, to require parties, whose defense rested upon different states of proof, to each one present his motion for a new trial to the court upon its own merits, and thus enable the court with less labor and difficulty to decide each. These and the other obvious considerations connected with the question, induced the court to take the course which it did

take in that respect.   This line of decisions began at the January term, 1884, in the case of *Long & Smith v. Clapp,* followed by that of *Dutcher v. State,* in 16 Neb.; *Real v. Hollister,* 17 Id., 661; *Boldt v. Burwig,* 19 Id., 739; *Real v. Hollister,* 20 Id., 112; *Dorsey v. McGee,* 30 Neb., 657.

These cases have, some of them, been before the people and the bar for seven years and have not, to the knowledge of the writer, met with general disapproval.   That this line of decisions should be attacked in those cases, where from some reason the practice has not been conformed with, does not present an unusual circumstance.   But it must be admitted that consistency and uniformity in the rulings and decisions of courts is next in desirableness to perfection.

A careful review of the Indiana cases satisfies me that while they are not entirely unanimous on the question now under consideration, those of them which we have followed exceed in number those which take the other view, as well as being more recent.

The 22d assignment of error, and the last one to be considered, is as follows: "The court erred in overruling the defendants' challenge for cause to juryman W. J. Timmerman, to which ruling and decision of the court defendants excepted at the time." I have copied the whole of the bill of exceptions relating to the challenge of these jurors and their examination.   It will be observed that while there were two jurors challenged, the overruling of the challenge to but one of them is assigned for error.   Attention is also called to the peculiar circumstances that neither of the Christian names of the jurors Timmerman is given, nor is there anything else in the bill of exceptions to enable the court to distinguish the one, the overruling of whose challenge is made the ground of exception.   Counsel for defendant in error, in the brief, argue that as neither of the two jurors Timmerman are designated or distinguished from each other by Christian names or otherwise, and both

were challenged and the challenge overruled as to both, the assignment of error which is assigned to the overruling of the challenge of W. J. Timmerman, the court being unable to distinguish which of the jurors is meant, must, unless it is shown that the challenge was wrongfully overruled as to both of them, sustain the court in overruling the same as to both of them. I think, however, that in the interest of justice, in this case, if it should appear upon the examination of the record that either one of the jurymen Timmerman showed himself upon his cross-examination to be disqualified, by reason of prejudice or otherwise, to serve upon the jury, the assignment should be construed to apply to him and not to the other Timmerman, if he is shown to have been a qualified juror. But I confess to my inability to distinguish between the two as to which, if either of them, is shown by the record to be disqualified.

Attention is also called in the brief to the fact that the record clearly shows that it does not contain all of the examination of one of these jurors upon his *voir dire.* This refers to the first of the Timmermans who was examined, and to the fact that it is only in his examination, in the nature of cross-examination by counsel for defendants, that he states anything about having read an account of the matters involved in the suit in a newspaper, but he does state in answer to a question put by the court that he didn't know anything about the facts except that which he read in "the newspaper." In section 669, page 951 of the Compiled Statutes of 1889 it is provided "that in the trial of any criminal case the fact that a person called as a juror has formed an opinion or impression based upon rumor or upon newspaper statements, about the truth of which he has expressed no opinion, shall not disqualify him to serve as a juror in such case if he shall upon oath state that he believes he can fairly and impartially render a verdict therein in accordance with the law and evidence, and the

court shall be satisfied of the truth of such statement." The above provision of the statute is confined in its terms to criminal cases; but in the absence of any provision providing what degree of knowledge, opinion, or impression, derived from rumor or the reading of newspapers, would disqualify a person to serve on a jury in a civil case, I incline to the opinion that this statute must be held to furnish the correct ruling.   This juror, in the first place, declares, in answer to the question of counsel for the plaintiff, "that he has no bias or prejudice against the saloon business or against men engaged in the business in any capacity as would preclude his giving their testimony the same weight and consideration as he would give the same man if he were engaged in other business."   Again, "that he has no bias or prejudice against the business or men engaged in it, so that he could not give to their testimony due consideration and weight the same as he would any other men."   Again, "that he would pass upon their testimony, considering only whatever interest that they might have in the result of the suit or relationship to the parties the same as he would any other witness."   He was then examined by counsel for plaintiffs in error and by the court touching his information, which he doubtless had before communicated, although the same is not contained in the record, that he obtained what information or knowledge he had of the case from an article which he saw in a newspaper.   It will be observed that the last question asked of the juror by counsel for the plaintiff in error as to whether "it wouldn't take some evidence to make you believe the other way?" the juror did not answer, or at least his answer is not containd in the record.

The other Timmerman, the Christian name of neither being given in the record, but whom to designate I have styled the second juror Timmerman, first declared upon his examination in answer to the question, "Whether he had any prejudice against men engaged in the business of keep-

ing saloon?" "That if the law gives a man engaged in that business the privilege, it is an honorable business." It is true that to the next question, "Would you take his word as soon as anybody else's?" he answered "No, sir." This examination of this witness it will be borne in mind was made by counsel for plaintiffs in error. He was not examined as to his meaning, whether the word referred to included his word on oath or not, but his examination by counsel for plaintiff in error was extended only far enough to enable him to say in answer to the proper question, "That he was a member of an organization which had for its object the suppression of the sale of intoxicating liquors." In answer to questions by the court, however, this juror did say, "That the organization to which he referred was political in its nature and not a secret society; that his connection with that organization and his interest in it wouldn't be such as would prejudice him against the men engaged in the traffic of intoxicating liquors to that extent that he wouldn't give his testimony the same weight as other men. Also, that he would be able to listen to the testimony upon oath of a man engaged in the liquor traffic and interested in the result of the suit and give it the same weight as he would the same man if he was engaged in other business and interested to the same extent, and that he wouldn't allow the fact of his being engaged in the liquor traffic to influence him." Looking at the answers of this juror, and giving them the meaning which the juror evidently intended they should have, I cannot construe them as showing prejudice or partiality in the mind of the juror, which made it error on the part of the court to overrule his challenge. I will state for whatever it may be worth that there is no evidence in the record of a peremptory challenge of any juror by the defendants, or either of them.

The fact that the deceased obtained the intoxicating liquor upon which he became intoxicated, and which intoxi-

cation led to his death, in part from the saloon known as the "East" saloon, which, according to all the evidence, was kept by Scott & Gorman, depends upon the evidence of the witness George Stone, although he is to some extent corroborated by other witnesses, not in the fact of the purchasing of intoxicating liquors by the deceased or the witness, or the drinking of the same in the said saloon, but in the fact that they came out of the saloon just previous to going into the Reed saloon and there drinking. The fact of their drinking at all in the saloon of Scott & Gorman is squarely denied by the witness Jamieson in his testimony. The jury thus had the testimony of the witness Stone, slightly corroborated as it was, and its contradiction by the witness Jamieson before them.

So far as this court is concerned, then, the jury having found for the plaintiff, it must stand as settled in this case that the liquors upon which the deceased became intoxicated, and which intoxication led to his death, were in part obtained from the saloon of Scott & Gorman and from the barkeeper in their employment. As I view the law after such examination as I have been able to give to this case, this fact, when applied to the pleadings, the evidence and the attitude of the parties, fixes the conclusion to which we must come, and fixes the liability of each of the several parties defendant. The defendants Scott & Gorman being liable and having been sued jointly with the other defendants, and there being but one motion for a new trial and all of them having joined in the petition in error, if the evidence is sufficient to sustain the verdict as to Scott & Gorman, it must be sustained as to all the rest. There is but one motion for a new trial in the record and that was made on behalf of all of the defendants except Edgar L. Hall. Whether his name was left out purposely or through mistake is nowhere stated. There is in the case neither argument nor evidence especially applicable to the fifth assignment that the damages are excessive. In the absence

10

of any suggestion or argument pointing out wherein they
are excessive, that assignment must be overruled. The
judgment of the district court is

AFFIRMED.

THE other judges concur.